IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE

## ELLEN PATTY SEIBER v. TOWN OF OLIVER SPRINGS

**Direct Appeal from the Circuit Court for Roane County**
**No. 11627      The Honorable Russell Simmons, Judge**

---

**No. E1999-01228-COA-R3-CV - Decided May 8, 2000**

---

The plaintiff, a mid-level executive of the Town of Oliver Springs, "borrowed" various sums of money from a citizen of the Town over a three-year period which she repaid with sexual favors. When this activity came to light she was fired by the Mayor and City Administrator. Her suit, claiming breach of contract and discriminatory employment practices, was dismissed on motion for summary judgment. This appeal resulted. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of right; Judgment of the Circuit Court Affirmed**

GODDARD, P. J., delivered the opinion of the court, in which SUSANO, J., joined.
FRANKS, J., filed a concurring opinion.

Andrew R. Tillman and Summer H. Stevens, Knoxville, Tennessee, for the Appellant.

Robert H. Watson, Jr. and Nathan D. Rowell, Knoxville, Tennessee, for the Appellee.

**OPINION**

JUDGE GODDARD delivered the opinion of the court.

This is an action for damages for breach of contract and discriminatory employment practices. In the course of her duties as city secretary the plaintiff issued a building permit in September 1993 to S. A. Baldwin from whom she concurrently borrowed $600.00. Within a month she borrowed various additional amounts from Baldwin and this practice continued for more than three years.[1] These "borrowings" were not documented and were not intended to be repaid in specie, but by her sexual favors. This conduct inevitably came to light and the plaintiff was fired by the

---

[1]The "borrowings" aggregated, at minimum, $87,000.00; at maximum, $150,000.00. The affidavit of Baldwin, reproduced and attached as an appendix to this opinion, is essentially undisputed.

Mayor, and City Administrator on account of her immoral conduct.[2]  The termination was handled in a manner calculated to allow the plaintiff to "draw" unemployment compensation.  Upon the expiration of her eligibility, she filed a complaint alleging that her termination was unlawful because the Employee Handbook created a contract between her and the Town which provided that she could be terminated only "for cause."  She further alleged that the Town discriminated against her in violation of the Tennessee Human Rights Act in that she was treated differently than similarly situated men.

The defendant's motion for summary judgment alleged three grounds: (1) that the plaintiff could not establish a *prima facie* case for a disparate treatment claim of discriminatory discharge in violation of the Act; (2) the Employee Handbook does not constitute an employment contract; (3) the plaintiff is estopped from maintaining this action because she agreed not to pursue an action if she could draw unemployment benefits.

The motion was granted by the trial judge without comment.  The plaintiff appeals, and presents for review these issues:

I.      Whether the trial court erred in refusing to sanction the Town of Oliver Springs for spoliation of evidence.

II.     Whether the trial court could have found as a matter of law that discriminatory discipline was not involved in firing the female plaintiff for "immoral conduct," an affair.

   A.   Whether the trial court could have found as a matter of law that males were not treated more leniently than the female plaintiff.

   B.   Whether the trial court could have found as a matter of law that none of the male employees were similarly situated with the female plaintiff.

   C.   Whether a female, having made a *prima facie* case that similarly situated male co-employees have received more lenient treatment than she, must also prove that she was replaced by a male.

III.    Whether the trial court could have found as a matter of law that the Employee Handbook provided no protection to plaintiff against immediate and

---

[2]While the plaintiff agreed that her conduct was "wrong", she adamantly insisted that it was not immoral, thus apparently attaching no heightened significance to exacting a monetary price for sex.

discriminatory discharge.

IV.	Whether the trial court could have found as a matter of law that plaintiff, by receiving unemployment benefits, voluntarily waived all remedies for discrimination.

Our review is *de novo* on the record with no presumption of correctness. ***Carvell v. Bottoms,*** 900 S.W.2d 23 (Tenn. 1995).

## Discussion

### I

The relationship between the plaintiff and Baldwin caused "quite a stir" in the small town. The Mayor and City Administrator called the plaintiff "on the carpet" on April 14, 1997, and the proceedings were recorded, by consent. The plaintiff testified that at this meeting she was told that an appeal to the Town Council would be unavailing because a majority of the council members would vote against her. After this action was filed in August, 1999, the tape of the April 1997 meeting could not be found. The plaintiff accuses the defendant of the deliberate spoilation of the tape which she argues would confirm the "threat" made to her that an appeal to the council would be fruitless. In light of our disposition of this case we see no inducing need to discuss the issue of the missing tape.

### II

The plaintiff argues that the Employee Handbook constituted a contract of employment, because it spelled out the terms and conditions of employment including disciplinary and termination measures. This is not sufficient; to constitute a contract the handbook must contain specific language demonstrating the Town's intent to be bound by the provisions in the handbook. See, ***Rose v. Tipton County Public Works Department***, 953 S.W.2d 690 (Tenn. Ct. App. 1997). Accordingly, the handbook is not a contract of employment.

But this conclusion does not end our inquiry. The Handbook provides that dismissal may be exercised in either of two ways:

> 1. As the culmination or final phase of the disciplinary action process, as described in Section V of these rules and policies, or
>
> 2. When a Department Head determines that an employee has violated a provision of the Town Charter, a Town ordinance, an employee rule or personnel policy in such a serious manner that immediate action is required to protect the reputation of the Town, or to assure the normal conduct of Town business or performance of Town services. In such cases, as determined by the Department Head, the employee may be placed on immediate suspension, and a hearing must

-3-

be scheduled for the purpose of considering dismissal, before the Town Council within ten (10) days of the date the suspension is imposed. Notice of the scheduled hearing must be provided to the employee stating the nature of the charges, the action being recommended, the reason for it, and advising him/her of the right to respond to the charges in writing. . . .

The Handbook was enacted as an Ordinance of the Town and its provisions must be enforced. See, ***Williams v. Maremont Corp.***, 776 S.W.2d 80, (Tenn. Ct. App. 1988). Accordingly, the plaintiff was entitled to a hearing by the explicit terms of the Ordinance unless she waived the right to a hearing.

When faced with probable termination for the described misconduct while working for the Town, Plaintiff's husband urged her to negotiate with the Town so that she could draw unemployment compensation. Specifically, Mr. Seiber described the situation as follows:

> Q. Did you know that if she was terminated she would be unable to draw unemployment?
> A. I sure did and I knew that we couldn't afford it. And to this day I think it's more my fault over that than it is anybody's.
> Q. What do you mean it's your fault?
> A. If she signed - she called Stanley[3] and talked to Stanley about - instead of being fired could she change it so she could draw her unemployment. And her and Stanley, I think, or whoever was in the office, she did go down there.
> Q. Did she - did she draw her unemployment?
> A. Yes.

Plaintiff admitted that she told the Town officials she would not proceed with any action against the Town if they would help her draw unemployment. To facilitate this, the plaintiff signed a letter of resignation.

While the record is not entirely clear on the point, the plaintiff's application for unemployment compensation was approved by the State. As heretofore noted, when her eligibility expired, she filed this lawsuit.

But we advert to the testimony of the plaintiff concerning her dismissal vis-a-vis her resignation. She testified:

> Q. And on that meeting of the 14th were you asked to resign.?
> A. Yes, sir.
> Q. And you chose not to resign?

---

[3]The Mayor.

A. Yes.

Q. And if the City had terminated your services on that date - -

A. The City did terminate me.

Q. If the city did terminate your services on the 14th, you knew that you had a right to appeal that entire situation.

A. That's correct.

. . . . . .

Q. And on the 14th as you left, I guess the reason that you made them terminate you was because you were going to appeal the process.

A. That's correct.

Q. And you knew you had a right to do that?

A. That's right.

Q. Now, on the 15th, the very next day, you call Mayor Justice and tell him that you might give up those rights.

A. That's correct.

Q. And you might not appeal the process.

A. Correct.

Q. And all you wanted from him was to facilitate your being able to get unemployment benefits.

A. Correct.

Q. And you in fact told him that if he did that, you would not pursue any action against the City of Oliver Springs.

A. That's right.

. . . . . .

Q. . . . [W]hy did you decide to file this lawsuit. . .

A. Because of the ugly talk that was still going on.

In light of the plaintiff's testimony, we agree with the defendant that she knowingly waived her right to a hearing.

### III

The plaintiff next insists "that the trial court could not have found that discriminatory discipline was not involved in firing [her] for immoral conduct", because "the only question is whether a man would also have been fired for having an affair." She argues that any reasonable jury could conclude that the Town regularly treated its male employees more leniently than female employees, because:

1. Jeff Borum assaulted his foreman for which he was suspended for one day;

2. Houston Hicks was employed following his release from prison for killing his

-5-

wife;

3.      Ken Veach was "brought before the town council for lying";

4.      Several male employees engaged in a mass walkout by falsely claiming to be sick, but were not discharged;

5.      The Chief of Police has been charged with sexual harassment several times for which he has never been disciplined.

In interpreting the Tennessee Human Rights Act, Tennessee courts may look to federal claims brought under Title VII. *Carr v. United Parcel Service*, 955 S.W.2d 832, 835 (Tenn. 1997) In order to prevail on a Title VII claim, a plaintiff must first establish, either by direct or circumstantial evidence, a *prima facie* case of discriminatory discharge. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). There are four elements a plaintiff must show:

1.      Membership in a group protected by the act;

2.      Satisfactory performance in her position;

3.      Termination of employment despite satisfactory job performance; and

4.      That the employer attempted to replace the individual with someone outside of the protected class.

*Id*. See also **Mitchell v. Toledo Hosp**., 964 F.2d 577, 582 (6th Cir. 1992). If a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. **Texas Dep't of Community Affairs v. Burdine**, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 1094-95, 67 L.Ed.2d 207 (1981). If the employer then offers a legitimate reason for the action, the burden shifts back to the plaintiff to demonstrate that discrimination was a determinative factor in the decision. **McDonnell Douglas**, 411 U.S. at 804-05, 93 S. Ct. at 1825-26. However, the ultimate burden of persuasion always lies with the plaintiff. **St. Mary's Honor Ctr. v. Hicks**, 509 U.S. 502, 508, 113 S. Ct. 2742, 2747-48, 125 L.Ed.2d 407 (1993).

The plaintiff is a member of a protected class but there is no proof that she was replaced by a person outside of the protected class or received treatment different from that accorded to otherwise similarly situated individuals outside her protected group. After she resigned, another woman replaced her.

The ultimate question in any disparate treatment discrimination case is *whether the protected status* 'was in fact a *determining factor* in the employment decision.' **Barnes v. Gencorp, Inc.**, 896 F.2d 1457, 1465 (6th Cir. 1990). There is no proof of nexus between the alleged adverse employment action and plaintiff's gender. She admitted that she was terminated

for immoral conduct, and offered no evidence that gender played a part in her termination.

Plaintiff says that she was treated differently than male employees whom she alleges have engaged in "known" immoral conduct without being discharged or adversely affected in their employment. This averment is not supported. She admits that she does not have direct knowledge of any other employees of the defendant who have been involved in extramarital affairs and been treated differently from her.

After learning of the plaintiff's behavior, Mayor Justice and Administrator Veach became concerned that there could be some negative effects on the Town if it became known that the city's secretary was engaging in sex for money. When accused of a discriminatory discharge, the employer may defend by articulating a legitimate nondiscriminatory reason for the discharge and is entitled to summary judgment unless the employee responds with contradiction of the evidence of the nondiscriminatory reason. *Mangrum v. Wal-Mart Stores, Inc*. 950 S.W.2d 33 (Tenn. Ct. App. 1997); see also *McKinna v. Lasco, Inc*, 1997 WL 340918 at *1 (Tenn. Ct. App. 1997).

We think the behavior of the plaintiff justified the Town's action in terminating the plaintiff since the Employee Handbook provides,

> . . . [A]n employee shall in no way act in any manner which may discredit the Town Government, Public officials, Fellow Employees, or Themselves. . . The violation of any provision of the Town's Code of Conduct, . . , constitutes a basis for the Town to exercise disciplinary measures up to and including dismissal."

We agree that the decision to terminate the plaintiff was based on lawful, nondiscriminatory reasons. She offered no evidence in contradiction of the nondiscriminatory reason for her discharge.

The judgment of the Trial Court is affirmed and the cause remanded for collection of costs below. Costs of appeal are adjudged against Ellen Patty Seiber and her surety.

**Appendix**

**AFFIDAVIT OF S.A. BALDWIN**

STATE OF TENNESSEE            )
COUNTY OF ANDERSON            )

I, S.A. Baldwin, after being duly sworn according to law, do hereby provide this Affidavit regarding my involvement with Ellen Patty Seiber, hereinafter "Patty", and if called to the stand would so testify:

1.    I first met Patty through her work for the Town of Oliver Springs.  In September 1993, I applied for a permit for an addition to my trailer.  After I went to the Town to get the permit, Patty asked to borrow some money from me.  I agreed to allow her to borrow the money.  I went to get the money and returned to Town Hall to deliver it to her.  During the next month, she borrowed substantial sums of money from me on several different occasions.  Finally, one Friday evening in October, she called me and asked me to drive to Harriman, Tennessee at 6:00 p.m.  She told me that she didn't have the money to pay me back but that she had another idea instead.  I drove to Harriman and she called me on my car phone and told me to meet her at a hotel.  When I arrived at the hotel, she answered the door wearing only lingerie.  We began our physical relationship on that evening.

2.    Over the course of the next 3 years, I provided Patty with money when she asked for it and she met me regularly so that we could have sex.  She met with me three to four times a week.  Eventually I rented an apartment in Oak Ridge for our meetings.  She would come to meet me for sex at the apartment any time she had a reason to be gone from the office.  For example, if she left the office to run an errand, she would stop by the apartment so we could have sex.  She would stay at the apartment for approximately 1-1 ½ hours during the visits that took place during working hours.

3.    During my involvement with Patty, she often called me from work.  If her boss came in while we were on the phone, she would put me on hold until he was gone again.  We used these conversations to make arrangements to meet for sex and to exchange money.

Further the affiant saith not.

S.A. Baldwin